12-1151 et al. Columbia Gas Gulf Transmission, LLC Petitioner v. Federal Energy Regulatory Commission Mr. Floom, arguing for Petitioner Range Resources Appalachia Mr. Higgins, arguing for Petitioner Columbia Gulf Transmission Mr. Edgar, for Respondent Mr. Fetchemendy, for Intervenor Good morning, Mr. Floom. You may proceed whenever you're ready. Thank you. Good morning. You may please record. My name is John Paul Floom. I'm appearing today on behalf of Range Resources Appalachia, LLC. Range is a long-term firm shipper on the Texas Eastern and Columbia Gulf systems. They hold a 15-year contract that continues through 2032 for 200,000 decatherms a day of capacity on both pipeline systems. Range has no physical capability to monitor or manage the pressure differential between Texas Eastern and Columbia Gulf systems. And without action from this court reversing the FERC's decisions on the issues before the FERC, and the orders under review here, Range will have no ability to guarantee that the gas that it delivers for shipment on Texas Eastern will ever make it to the Gulf system. This court owes FERC no deference in its interpretation of Section 6.2 of Texas Eastern's tariff. That tariff provision specifically says that Texas Eastern is required to deliver gas at pressures as are available at the point of delivery and resulting from Texas Eastern maintaining a discharge pressure of 750 psig at the nearest upstream compressor station. And that would have been Danville? That would be the Danville station, yes, Your Honor. But I did not see in your complaint where you alleged that that 750-pound pressure had not been maintained at Danville. Well, Your Honor, respectfully, there's two points that I'd like to make about that. We did allege that in our complaint, in paragraph 24 of the Range complaint, where we discussed the applicability of the tariff provisions and Texas Eastern's violation of those, as well as our violation of our service agreement with Texas Eastern. But also, Your Honor, the court doesn't even need to get to that point necessarily. We need an undoing of this errant interpretation of the tariff itself. If we accept, as a matter of fact, the FERC counsel in their brief, where they stated that we can resubmit our complaint properly alleging those claims, as Your Honor has pointed out, perhaps we should have played it differently. We still have the legal error of FERC's interpretation of Section 6.2. I don't see in paragraph 24 where you alleged that there was less than 750 psig. Rather, just quote Section 6.2, saying that the tariff requires Texas Eastern to deliver gas at pressures that are available at the point of delivery and resulting from pipeline maintaining a discharge pressure of 750 psig at the nearest upstream compressor station, which is what the tariff says. Certainly, Your Honor. There are two points on that. Again, the FERC then, taking what we have put in our complaint, the FERC then interpreted Section 6.2 to completely read out the resulting from the maintenance of a discharge pressure. They did. It's true. They did not quote that. But I guess my question is, is the inference, you're saying it was a necessary implication of what you've pleaded, that the pressure was lower at Danville than it should have been because, in the end, the pressure down at the interchange was lower. But is it entirely fair to assume the gas that's flowing 37 miles down pipeline would lose a lot of pressure between the Danville station and the interconnect? That's a great question, Your Honor, and we would have loved it if FERC could actually ask the question and given us the opportunity. But it's your burden. It's your burden. Certainly. So without the allegation that the pressure at Danville was below what it needed to be and that that was the cause, it doesn't seem like you've alleged any violation of Section 6.2. Well, Your Honor, I would suggest that also the reference to Paragraph 37 of the joint complaint in that same Paragraph 24 of the range complaint points out that there were some pressures that we had available from the Columbia Gulf system in the 2019 curtailments, and those pressures were well below the 750 PSIG limit that was at the Danville or that Texas Eastern was required to maintain under its tariff. So we did allege that there was a mismatch between the 750 PSIG discharge pressure that should have been operating at the Danville station and the pressures that were apparent on the Columbia Gulf side of the system. Counsel, I think in Paragraph 37 of the joint complaint the essential argument is that Texas Eastern had capacity. Its MAOP was higher than the average delivery pressure that it would have needed. But it does not say that we know there was a breach of Section 6.2 because if there was a 750 PSIG maintained at Danville, it would have been above X at Adair. Isn't that the kind of allegation and explanation you would have had to make to make this claim? Respectfully, Your Honor, we certainly believe we've pled the complaint properly and the allegations properly. In hindsight, had we pled it differently, we probably would not be here before you today, hopefully. But the problem that we have with the FERC decision is just take as a fact or just take as an assumption here that we did not plead it properly. And FERC could have said that in its initial order dismissing the complaint that you didn't address the issues that are in the tariff. We'll leave those for another day. As FERC counsel has mentioned in the FERC brief, we have the right to replete these claims. The issue that we have is that FERC has improperly interpreted the tariff to read out the obligation. So even if we were to raise this claim in a future complaint, So they omitted it, but I don't think they're depending on reading it out. They're just not crediting the implication that you would like them to credit. I would suggest, Your Honor, that unfortunately the FERC in two instances in both the order on rehearing and the dismissal order stated that the tariff imposes no obligation on Texas Eastern with regard to minimum pressures. With regard to minimum pressures at their interconnect. I'm sorry, Your Honor. You're saying that you read that as saying that there's no requirement of pressure at Danville. I think they're not even reading you to have alleged that, so their statement to that effect doesn't negate that. But they don't think you've alleged. They're not negating. And if that is how the court is viewing the FERC's determinations and if that is how FERC counsel is willing to state that the agency is reviewing this, I don't think we have an issue at this point, Your Honor. We can re-raise the claims before FERC. Our concern is that we re-raise these claims at FERC. FERC says, no, we addressed that and said there's no tariff obligation. So right now we have what could be construed as a very broad reading of responsibilities or lack of responsibility under the tariff that we are now precluded from raising in a subsequent complaint under section 6. But how could the construction of the tariff, the tariff applies to, you know, to all shippers, right? The 750-pound requirement is in your, I guess, firm agreement with Texas Eastern, right? So, actually, Your Honor. How can the construction of the tariff undermine what they're required to do in the firm agreement? Am I missing something? Well, under FERC policy and precedent, Your Honor, the service agreement, actually the service agreement itself incorporates the tariff by reference. And under FERC policy and precedent, the service agreement cannot control over the generally applicable tariff provisions unless there is a specific provision that removes that right. The way that the service agreement itself is structured is it says it's at the available pressure. But the base level default rule for all shippers on the system, as Your Honor points out, would be the tariff. The service agreement does not modify that obligation that Texas Eastern has to maintain that 750 PSID. I see. So if we said that we don't read FERC's opinion as essentially undermining the service agreement requirement that there be 750 pounds of pressure at the nearest compressor station, that would alleviate the concern that you are articulating? With respect to Section 6.2, yes, Your Honor. With respect to 6.2? That is correct, yes. We still believe we've pledged this properly, and that should have been taken before the FERC, obviously. Understood. And is there anything in the record about how quickly natural gas loses pressure on a pipeline as it travels away from a compressor station? That would have been a question that we could have asked, Your Honor, in discovery, which is why we wanted an evidentiary hearing. Range expected to receive an evidentiary hearing. Texas Eastern is the only party in the proceedings before the FERC that has the information that we would have needed to prove up the claims about whether they were in violation of the tariff or not. Absent the hearing, we can't do that. FERC does not offer discovery rights to parties when they file a complaint. You have to have the process set for an evidentiary hearing before the rules of FERC apply for discovery. So we had no opportunity to really bolster the analysis. I'm sorry, Your Honor. Did you have a question? No. To bolster our analysis of whether Texas Eastern was in violation of the tariff absent the hearing. FERC's complaint rules do contemplate that we would have a hearing with the ability to have discovery rights to prove up that claim. On your claim that you were similarly situated but not treated as well as other shippers, are the Liberty Meter and the Kentucky Energy Meter, do they interconnect or not? They are meters with, I believe, local distribution companies, Your Honor. So they would be just essentially a meter off of the pipeline. They're not interconnecting with an interstate pipeline system. But there is an interconnect to a distribution. I don't actually know that, Your Honor. I'm sorry. The reason I'm wondering is just whether if they don't interconnect, then that might be an explanation why they wouldn't experience the same reduced flows as out of DARE. Well, certainly. So an interconnection, Your Honor, in the sort of industry sense of it, would be a connection between an interstate pipeline and an interstate. So in the context of, I think, as you're describing it, and I don't mean to put words in your mouth, but they do interconnect with a facility. I believe that they are local distribution systems. It would simply be a meter measuring the amount of gas flow going from the Texas eastern system to that system. And that does point out the problem that we have here with respect to the similarly situated shipper context. Those two meters are on the same mainline path as the DARE interconnect. The fact that they received 80 percent of their nominated quantities during one of these curtailments and range received zero is a clear indication that range was treated differently, treated in a situation that could result in undue discrimination against range. The fact that we were not presented with the opportunity to prove up our claims about being similarly situated is really an error in the application of its own rules and its own precedent. FERC has declared that that similarly situated context and that review is a uniquely and intensely fact-specific review. So that is something that we expected FERC to take into consideration. I would also... Can I ask a question about the reservation credit issue? Sure. As I understand it, I know this is simplifying, you're essentially saying you should be entitled, you would be entitled to 10 more days of reservation credits if force majeure was not properly declared, right? For one of the audits, yes. For one of the, for the 2021. And what FERC said, at least in part, was that that was irrelevant because range had actually already withheld payment for those reservation credits. And what they say in the initial order and on rehearing is that, for some reason, means you're not entitled to relief in this proceeding. Do you... I didn't see a response to that holding in your briefs. Do you have an argument about why that's incorrect? It's incorrect because, yes, we withheld payment, but we would have to make the payment. If the FERC determines that there was an appropriate declaration of a force majeure and we were not entitled to the full amount of reservation charge credits, then we would have to pay those to Texas Eastern. So you were basically seeking a declaration? Essentially, yes. Okay. I don't really follow that, and I guess we have to ask FERC, you know,  if it's not force majeure, then you would be entitled to withhold more of what you're withholding. If it is force majeure, you would have to pay for the first 10 days. So in the reservation charge crediting context, Your Honor, if there is a force majeure outage, there's a 10-day safe harbor in which the pipeline is entitled to recoup the entirety of reservation charges from the shipper. Right. After that, there's a full payment or reservation of the reservation charge credits. We'll call them demand charge credits so we can avoid reservation on both sides of that statement. So the demand charge credits themselves are paid or, sorry, there's a credit back to the shipper of the amounts that would have otherwise been owed. In a non-force majeure context, there is no 10-day safe harbor. They simply just take effect immediately. So the question becomes, what is owed to Texas Eastern from Range? Right. And Range did withhold, assuming that they had full reservation charge crediting capabilities and were entitled to that difference. And as we get to FERC and if we have a final order from FERC about this that we do owe that, that is the damage to Range, and that's why we needed to have an understanding of the applicability of the force majeure declaration. But isn't the order written as if you're never going to have to pay that? I mean, that's the way I read it. Maybe I just wasn't paying close enough attention. The funds that you withheld, isn't it written as if, like, there's no harm because you withheld those funds and you're never going to pay them? So, Your Honor, respectfully, I don't know how FERC could think that. Its rules state that the reservation charges are owed to the pipeline. That's what the tariff requires and that's what the service agreement requires. I can't see an envisioned situation where FERC would have assumed that we get to keep those no matter what. So it does present a bit of a, I don't know what FERC was thinking. Perhaps a FERC counsel can address that for you, but that certainly is a puzzling question for us as well. I have a question about the interaction between the pipeline pressure claim and the force majeure argument. This is not the way they discussed it, but if FERC is correct that it's on your client's head for not having written minimum pressure at the interconnect into its contract, and therefore Texas Eastern has no obligation to maintain a minimum pressure at the Adair interconnect, then why is force majeure even relevant? Because when something happens on Texas Eastern's pipeline, there's no minimum pressure obligation to be violated there. That's a great question, Your Honor. That's another point that we did raise in our complaint with respect to the application of Section 17.1 of the tariff. That's not something that we've briefed before this Court, so I can certainly address that if you'd like. But the point being, and this is an issue that Range has struggled with, Range, as I mentioned at the beginning of this argument for you, has no ability to physically change how the gas is flowing on the system or increase or decrease pressures. It does have ability to write a contract up front. And that's, I mean, I read FERC's orders to say that's where the problem arose. And I agree with you that that is what FERC's orders say. I question, though, and I ask Your Honors to question as well, how is a shipper that has no optics into what the pressures are between two interstate pipeline systems supposed to know what the minimum pressure would be? And that's the real, for us at least, as the shipper on the system, we don't know what the pressure is other than what the tariff states at the 750 minimum that's going to be discharging from the upstream station and the 575 is the suction pressure on the nearest downstream station. We don't have any understanding if Range had negotiated a 600 PSIG minimum at that point. Is that enough? Is it not enough? And so the question, really, that I think from a broad policy perspective, that FERC never really took into account here is how is it that the shipper, the one entity that never has the ability to change the pressure, supposed to negotiate about pressure and that doesn't have any of the information related to the pressure other than an AOP. That's public information. Everything else is private. We can ask her, but my understanding from having read their orders would be that is precisely why it would be incumbent on a shipper to write in a minimum pressure obligation, precisely because you don't have any ability once you're relying on them to ship. And that's a fair point, Your Honor. I would suggest that how does the shipper know what the pressure should be? I agree that perhaps a shipper should, from a contractual perspective, make sure that they're covered under their contract as best as they can. They do have a tariff that says that, the pressure obligation. Just back on the force majeure issue for a moment. Sure. So there are these 10 days that either free pass for Texas Eastern or not. Can we tell from the record which days those are?  I don't know, Your Honor, but I believe that they were the period between, I think it was late May, early June of 2021 through the end of July was the 2021 outage. So I believe it would be that first part of June of 2021. I thought it was, so if it's maybe May 28th to June 8th or something like that.  And then the period following that is a little unclear to me why it's zero for 23 days. So the nominated quantity, so the force majeure doesn't necessarily only last for 10 days. The outage that occurred there, at least for some of the lines that are at issue that connects with their interconnect, the PHMSA had required that, I guess, they refused to grant a waiver to Texas Eastern to continue operating at its existing MAOP. With one of those lines in particular, there was no obligation to reduce the pressure. So that is also part of our consideration and concern here, is what was the requirement for the declaration of the force majeure. But the point being, Your Honor, sorry, is that the pressure differential between the two pipeline systems at Adair continued for a period of way more than 10 days. That maybe was related or not to the force majeure. So with respect to Northern Natural. Yes, Your Honor. My reading of the case is that one difference is that between, I guess, I'm not sure the right terms, kind of the downstream pipeline and the upstream pipeline, there was a minimum pressure agreement in the agreement between those two entities, which we don't have here, at least explicitly. But the bottom line is the court said just looking at, or FERC said, just looking at the tariff of the receiving pipeline, there was no obligation with respect to adjusting pressures in order to be able to receive the gas from the other pipeline on the other side of the interconnect, so to speak. And that was really all they needed to do to hold, to decide that case. And FERC says, you know, anything else we said there is victim. So what's wrong with that way of looking at Northern Natural? Your Honor, my colleague was going to address the Northern Natural issue. Oh, I'm sorry. But actually, just to clarify. I can wait. Okay. I can clarify if you wouldn't mind, Your Honor, on two of those points, though, that just for your benefit, there was not an existing firm service agreement between Northern Natural and ANR at the time of the FERC order that had expired prior to that point, number one. Number two, just for clarification. The one that before it expired, it had the minimum pressure obligation. That's correct, yes. And just to be clear, to align the parties correctly in the way of thinking about this, ANR and Columbia Gulf are both the downstream pipeline. Northern Natural and Texas Eastern are both the upstream pipeline in this context. So just to circle back on something that I think you answered, if there were no minimum pressure obligation at their interconnect for the reasons relating to the interpretation of the tariff and agreement, then that would undercut the importance of the force majeure or not finding because range would not be owed any credits. Is that right? In the context of these two curtailments, yes, Your Honor. That's correct. We would be owed nothing if you were to rule them out. Thank you. All right. Thank you very much, Your Honor. And I think you've reserved a couple minutes. We did. I did two minutes, Your Honor. We'll give you time even though we took you over. Thank you very much. We appreciate it. I believe we're next hearing from Mr. Higgins. Thank you, Your Honor. Good morning. Matthew Higgins for Petitioner of Columbia Gulf. I have three points to make this morning. First, why Columbia Gulf has Article III standing. Second, why FERC departed from its past precedent without reasonable explanation. And third, why the interconnection agreement and FERC's misinterpretation of that agreement merits remand. And I'd like to quickly start with standing. I'm also happy to get right into Judge Wilkins' questions if he prefers. But if I may, Columbia Gulf's standing is very clear from Trillo's affidavit. First, he makes very clear that from the 2019 and 2021 curtailments, Columbia Gulf suffered significant administrative and operational harm. And that's a point that FERC's briefs don't really get into. But administratively, FERC was required before the curtailments to issue the notices at J.A. 177 to 185, and that comes directly from FERC's regulations. And we submit that is enough to constitute a concrete injury under Article III. I think you said FERC was required to issue the notices, but you mean Columbia Gulf. Oh, no, Columbia Gulf. Excuse me. I misspoke, Your Honor. Yes. Yeah, and that's under 18 CFR 284.13d. Columbia Gulf is required to issue those notices before curtailing ranges. That kind of injury is only redressable if it happens again, right? You want us to make it not concluded. Correct. Yes. So we have a concrete injury that comes from these curtailments, and then we have a substantial risk that these curtailments will happen in the future based on what Trillo said in his affidavit, that the conditions that existed in 2019 and 2021, the pressure differentials that existed, that gave rise to these curtailments. The conditions are even worse now after the Louisiana Express Pipeline went into service. And based on those conditions, Columbia Gulf has taken steps to mitigate the risk of that substantial risk of harm coming in the future from those curtailments. It is taking Texas Eastern's gas, which is lower pressure, and looping it around its own pipeline, its own system, to a compressor station 12 miles away, compressing that gas, sending it back down, and then which allows the gas to actually enter into Columbia Gulf's system. Without that workaround, it would not be able to receive Texas Eastern's gas. And because of that workaround, Columbia Gulf is using its compressor without any compensation. There's additional maintenance costs. There's additional operational costs to that, which Columbia Gulf otherwise would be allocating, reserving for its paying customers. Instead, it is using to compress Texas Eastern's gas. FERC says that that's a voluntary obligation you're taking on, and that's not sufficient to confer standing. Correct. I think what FERC's argument is kind of in two parts. One, I think they're saying it's voluntary or self-imposed because they don't believe that Columbia gas is harmed from the curtailments. They don't believe that Columbia gas suffers the concrete harm when it curtails ranges service. But, of course, it does. It suffers the administrative harm that I referenced, the JA-177 to 185. And there's massive operational harm. When ranges lower pressure gas does not come in to Columbia Gulf's system, there is a void, and Columbia Gulf needs to scramble daily to fill that void. And this is laid out in Trillo's affidavit. It needs to use third-party storage from gas. It needs to get excess gas from other pipelines in order to have enough gas in its system so that the pressure is high enough so that its system actually works. It also needs to stay in constant communication with range throughout these curtailments, which is another type of operational harm. This reminds me of something that was a little bit mysterious to me in the record, which is why the flow levels between June 9th of 2021 and July 1st of 2021 were zero, when I thought that there was some pressure on Texas Eastern, and why was it not being – why did Columbia gas go all the way down to zero? Yeah, so the flow levels from range were zero because that gas was lower pressure, but there was other gas on the pipeline that was higher pressure that was needed in order for the pipeline to function properly and actually – Range had a reservation, and so I just don't understand why some of range's gas wasn't going. So none of range's gas could be going at that point because the imbalance had grown so high. Once the imbalance had grown as high as it did, accepting Columbia gas wasn't – Columbia Gulf wasn't able to accept any of range's gas because that was lower pressure gas. Did other shippers gas on the same pipeline at the same place, or no? Not on the Texas Eastern pipeline, but kind of where the Texas Eastern pipeline at the interconnect around that area. Other gas was flowing through. So gas needed to be at that point on the pipeline in order for the pipeline to actually function properly. It just could not have come through the Adair interconnect because of the pressure. So there's another pipeline, analogous to Texas Eastern, that Columbia Gulf effectively turns to at that point. That's my understanding, yes, Your Honor. The Columbia Gulf needs to get this additional gas that comes from excess gas from other pipelines and third-party storage, and that gas does not come through the Adair interconnect. It comes through other sources. So it wouldn't have been possible at that time for Columbia Gulf to, let's say, isolate a lower-pressure segment of its pipeline to receive more than the zero decatherms during that period? Correct. That's the abnormal mode that Trillo discusses in his affidavit. It isolates part of its pipeline, one of its three pipelines, to essentially – which is supposed to be going south. It pushes Texas Eastern's gas north, compresses it there, and sends it back down. But that's only possible if the pressure differential is manageable. And during the dates that Your Honor Pillar is referring to, the pressure differential is simply not manageable. So you said you were going to talk about the interconnect agreement. Yes. If I may answer Judge Wilkins' question first, starting with Northern Natural and specifically FERC's treatment of the Columbia Gulf tariff. So the tariff for the receiving pipeline in Northern Natural was ANR, and it has substantially identical language to Columbia Gulf's tariff. And what Northern Natural says is that that tariff language applies because, to answer Your Honor's question, there was no agreement, in effect, between the delivering pipeline and the receiving pipeline. At paragraph 23, Northern Natural is very clear that that agreement expired. So in its ruling at paragraph 23, which relates back to ANR's argument at paragraph 14, what FERC said was that it agreed that that provision, the provision, again, in ANR's tariff, which is substantially identical to Columbia Gulf's tariff, that it requires Northern Natural, the shipper, to deliver gas to ANR at pressure sufficient to enter the pipeline. And then at 23, it said we also concur with ANR's interpretation of its tariff requirements. So in Northern Natural, FERC applied substantially identical language, which included the word shipper, to the delivering pipeline. And here it simply did not. And kind of more than that, it didn't even acknowledge that in Northern Natural it applied this substantially identical tariff language to the delivering pipeline. And that unexplained about-face on this tariff interpretation is an independent basis for Baikonur. If there are no further questions on Northern Natural's interpretation of the tariff and how that relates to Columbia Gulf's tariff, I would conclude by noting that FERC only really offers a paragraph responding to its differential treatment of this tariff language. And it is a lone basis for remand so that FERC can acknowledge its past precedent and then either apply that past precedent, that interpretation of substantially identical tariff language, can apply that to Columbia Gulf, can knowingly abandon it, or offer some sort of explanation for why this substantially identical language applied in a previous case but doesn't apply to this case. And then second, and apart from the tariff language, FERC alternatively ruled, and this, again, under substantially identical facts and separate from the tariff, that delivering pipelines would be responsible to modify its facilities to actually make deliveries. And the order on review, FERC's main rationale for not applying that rule was that in Northern Natural the delivering pipeline was the plaintiff and here the delivering pipeline- and here Columbia Gulf receiving pipeline was the plaintiff. But under Kentucky Municipal and this Court's other precedents, you know, past precedent counts as past precedent regardless of which party raises that argument. But I guess what I'm not understanding in your Northern Natural argument is that Northern Natural paragraph 23 does say that section 11.1 in our tariff specifies that gas be delivered at a pressure sufficient to allow gas to enter ANR's system. Yes, FERC acknowledges that that statement is there. Yes, that identical language is in Columbia Gas's tariff. But what FERC holds is that that doesn't mean that Columbia Gas has any- I'm sorry, that in that situation ANR has any kind of obligation with respect to changing its system or decreasing pressure or anything in order to receive the gas, which was in effect the relief that was being sought in Northern Natural. And so they had no occasion to rule on what the kind of obligations were of the- I guess they're saying that this is- Northern Natural was seeking a remedy vis-a-vis ANR and FERC said you're not entitled to that remedy, essentially. Correct. FERC says you're not entitled to that remedy because any obligation to perform a system modification would lie with the delivering pipeline, which in that case was Northern Natural. So what this Court says counts as past precedent is not just the result that FERC comes to, which Your Honor Wilkins correctly knows is the result was nothing was ordered. But what it also looked at is the steps that FERC takes to reach that result. And the steps that FERC took to reach that result were saying the receiving pipeline has no obligation to modify a system in order to receive the delivering pipeline's lower pressure gas because those obligations rested with the delivering pipeline. And that is the rationale I think very clearly that FERC used, and that's the rationale that we would ask them to reasonably explain why it doesn't apply, and they simply haven't. I thought their understanding was that the language in 4.02e of the interconnection agreement just requires both parties to be assured of having the physical capacity to deliver or receive gas through the interconnection to the maximum allowable operating pressure, just giving each pipeline the flexibility to operate up to their maximum allowable operating pressure but that without a contract term requiring a minimum pressure, it just doesn't support the claim that it violates that provision when they don't operate at a minimum pressure. Right. So this is separate from our Northern Natural argument. Northern Natural applies only when it's inconsistent with the contractual obligation. But no, absolutely. The 4.02e contract we think is very clear based on the word therefore between the first and second sentence. The first sentence is all about pressure. It's all about being able to operate at the pressures up to the MAOP. And the second sentence is all about having physical capacity to enable those types of pressures. I think what FERC is saying is there's a physical capacity requirement in sentence 2, and in sentence 1 there's a kind of pressure discretion, but the word therefore links those two sentences. I mean, if the physical capacity that Your Honor Pillard is referring to doesn't relate back to the pressure in sentence 1, there's no reason to link these two sentences together with the word therefore. We think it is a plain pressure requirement, it is a plain requirement to be able to deliver pressure up to the levels of the receiving party's MAOP. And, you know, obviously Texas Eastern has not done that in this case. Can I go briefly back to Northern Natural? Yes, please. Because what the Court focuses on is 11.1 says explicitly that Northern Natural, the shipper, is obligated to deliver at a pressure sufficient to allow the gas to enter transporter's existing pipeline system, and it rests on that. Yes. Are you telling us that there's the exact same language as in Texas Eastern's tariff? It's the exact same language. I'm happy to read it for you, Your Honor. Why are we talking about the interconnection agreement in section 6.2? That's in Texas Eastern's tariff. It's in Columbia Gulf's tariff. I'm sorry, Your Honor. In Columbia Gulf's tariff. The section 6.2 argument relates to the delivering pipeline Texas Eastern. Our Columbia Gulf tariff argument relates to Columbia Gulf's tariff. And, again, it's also JA 4344, the joint complaint, paragraph 75, lists side by side ANR's tariff, the receiving pipeline in Northern Natural, and Columbia Gulf's tariff. Both say Columbia Gulf says shippers shall deliver gas or cause gas to be delivered to transporter at the receipt point at a pressure sufficient to allow gas to enter the system. ANR's tariff, which, again, is in the complaint. There's no procedural bar on this question at all. It's in the complaint, in the order, in the rehearing order, squarely presented to this court, says shippers shall cause the gas to be delivered at the receipt point. I'm sorry. Can I have a picture so I can follow as you're reading? Oh, sure. Sorry. Okay. Opening brief 49. Oh, I thought you were in the JA and the joint complaint. Lists them both. And, yeah, it's JA 909 is where ANR's tariff is. Columbia Gulf's tariff said JA 4344. But the opening brief lists them both apply to shippers in Northern Natural, again, very squarely said that language imposes an obligation on the delivering pipeline to deliver gas at pressure sufficient to enter into the receiving pipeline system. FERC has not acknowledged that order. FERC simply says that Texas Eastern is not a shipper. Therefore, this provision does not apply, this provision from Columbia Gulf's tariff. But, again, you know, FERC has this past precedent, and it has not acknowledged it. And by not acknowledging the past precedent, it commits kind of a textbook example of arbitrary and capricious reasoning. I'm not sure that I follow that argument. The FERC says that Northern Natural was not a shipper. And so the tariff says shipper shall cause. So FERC says that means that it was really up to range to cause the gas to be at a pressure sufficient to enter Columbia Gulf's system. And range could have done that if they had written their service agreement differently, but they didn't. And so that's how they harmonize Northern Natural. Isn't that what they do? I don't think so. They never acknowledge that in Northern Natural on their orders on review and the rehearing petition, the rehearing order, and even the briefs before this Court, they never acknowledge paragraph 23, which squarely applies substantially identical tariff language, referring to a shipper, as Your Honor said, applying that language to a delivery and pipeline. That's what FERC did. But it's clear that shipper in Northern Natural was actually Northern Natural, whereas here they're saying the shipper is range, and range had the, I mean, I'm just repeating the premise of Judge Wilkins' question. But also that whole discussion wasn't really central to the holding in Northern Natural, was it? Well, two things. Northern Natural did acknowledge that shipper in other contexts in the industry does refer to customers of pipelines. That's in paragraph 29. It calls Madison Gas Electric. It says the only existing or potential shipper to comment is a customer at the pipeline. But nevertheless, it applied that language, the substantially identical language, to a delivery and pipeline. So in Northern Natural, FERC was aware of the tension. But that wasn't really a holding. No, I think it was, Your Honor, the first basis. I mean, paragraph 23 and 25 are the reasons for which FERC denies the delivering pipelines petition. It says you – In Northern Natural? In Northern Natural. It says the receiving pipeline does not have an obligation to lower its pressure because the receiving pipeline's tariff governs, and the receiving pipeline imposes an obligation on the delivering pipeline to raise their pressure. And then at 23 and 25, it says that if modifications are necessary, the record was incomplete. It says if modifications are necessary, those obligations rest with the delivering pipeline. And that comes directly from the tariff. There's a tariff-based reasoning for why those obligations rested with the delivering pipeline in paragraph 23. And there's a non-tariff-based reasoning at 25. And neither one of those has FERC given a reasonable explanation for why they would not apply squarely to this case. You haven't addressed the basis that FERC relied on, which was that the 402e argument was forfeited, wasn't preserved. Right. So, but FERC, their main argument, I think, is that this Court need not reach the merits of the 402e legal challenge because there was an alternative basis for dismissing the 402e claim. But that's not required for two reasons. First, I'd say FERC largely relies on the BDCPS case. But BDCPS is very different from this case. Here, the merits decision was effectively a dismissal with prejudice, and the ruling about the sufficiency of the complaint was a dismissal without prejudice. Columbia Gulf and Range would have been free to file a new complaint that wouldn't essentially be futile if there weren't the merits. Would not have been free? Yeah. Correct. Right. Essentially what FERC is asking Columbia Gulf and Range to do, as I understand their brief, they say we're free to file a new complaint with these claims raised. And respectfully, we don't think that's a path that BDCPS requires, given how different the facts are. But it is available to you. Our understanding is that it is available to us. I mean, the best case scenario, we believe this Court shouldn't do that because it would be a big waste of judicial resources. I mean, we would file a complaint before FERC, knowing that they would deny the 402e claim, file a request for a hearing, knowing FERC would deny that, and then file another petition before this Court, asking them to review the same 402e language that we're asking this Court to review today. And I note, too, that the BDCPS case came on a very different – like, the question came before the Court in a very different way. Here, FERC reached out and decided the 402e claim without it being in the complaints, without Columbia Gulf or Range raising that issue, and then is saying that – upheld that ruling and the rehearing request, and then is saying that this Court is barred from hearing the merits. So the facts are very different from BDCPS. I'd say the facts are different enough that that holding does not apply here. And for the reasons I explained about the waste of judicial resources, there's no reason to not review the 402e claim, given the lack of controlling precedent and the waste of judicial resources that would come about from that. Are there no further questions? Thank you. And I gather you've also asked for a couple of minutes for rebuttal? Yes. Okay, we'll give you a couple minutes. Good morning, Mr. Edinger. Good morning. And may it please the Court, I'm Scott Edinger for the Federal Energy Regulatory Commission. Thank you for hearing this case. I'd like to start with some of the procedural issues and the disconnect between the scope of the complaints that were filed in this case and what's being asserted on appeal. The Commission was very clear in its orders that we think the petitioners here have the issues backwards. So the Commission was very clear that it need not consider arguments raised in the – and related to the interconnection agreement. It said that very clearly in the rehearing order, Paragraph 9 and Note 34. And the Commission pointed out in the following paragraph, Rehearing Order Paragraph 10, JA 970, that the complaints govern the scope of the proceedings. So it's fair to confine the petitioners here to the scope of their proceedings. And there's a fairness element to this because the Commission's rules, 18 CFR 385, 713D, do not permit – in fact, prohibit answers to rehearing. So it's not fair to the respondent in this case, Texas Eastern, to be chasing a moving target. So there's good reason for the Commission to dismiss arguments related to the upstream compressor station and the interconnection agreement. I do want to address Paragraph 24 of the range complaint. That seems to be the paragraph that range feels is most compelling. And I would – the Commission pointed out in Paragraph 9 and Note 39, JA 969 to 970, that the complaints never demonstrate that Texas Eastern failed to operate the upstream compressor station, which is the Danville Compressor Station, at 750 pounds. That's point number one. Point number two is there's – the complainants never demonstrated that there's a connection between such failure to operate at 750 and what happened at the – I'm going to say border – at the interconnection between Texas Eastern and Columbia Gulf. We know that pressure will diminish as the pipeline goes on, and there's roughly 38 miles between Danville and the interconnection here, and so we would expect the pressure to decrease somewhat. And there's nothing in this record to provide that causality. So it's your position that it is not a reasonable inference from the allegations of the complaint that Danville must have been operating below 750 pounds per square inch, given the concerns about the lower pressure at the Adair interconnection. I think that's absolutely correct, Judge Pillars. And I would add a reference as well to 18 CFR 385-206B. This is the Commission's regulations addressing what a complaint should do, and a complaint should do two things. It should clearly identify the action or inaction and explain how it violates the applicable statutory standards. And if I may say this, these are sophisticated parties in this case, and there's a lot about this case that's very confusing, but this would not be difficult to say in a complaint. We allege Texas Eastern is not operating upstream compressor station at 750 full stop. It's as simple as that. And then to ask, and our Order 602 that the petitioners cite on reply, they quote a couple sentences. The Commission goes on in that order and explains that, yes, they're right. There's often information that's only within the control of the respondent, but in that case you should provide what you can, and then you should ask for the information that you want, and the Commission will decide such things on a case-by-case basis. And that wasn't done here, and I would suggest to your Honors that that just further drives home the point that this was not the claim that was advanced in these complaints, and the Commission was absolutely correct to reject it. Didn't the Commission just leave out when it quoted Section 6.2 the requirement that delivery pressures had to result from maintaining a discharge pressure of 750 PSIG at the nearest upstream compressor station? I mean, that raises a little bit of a question mark in whether the Commission is dealing with that allegation, which was plainly alleged and was in the agreement. The Commission quoted the tariff, certainly, in paragraph 38 of the initial order, but the parties never, the complainant here, never alleged that that was the basis for the complaint. The assertions from the get-go were that Texas Eastern had an obligation at the interconnection to deliver gas that actually complied with whatever pressure Columbia Gulf was operating at, and they derived that rule really from their misinterpretation that we may get to about Northern Natural. That's really their theory, and that's really what ranges after here. This business about the upstream compressor station was never part of the original complaint. If I may also add one more bit to that. In its answer, Texas Eastern pointed out that there lacks a clear explanation. They said this at Texas Eastern answer to the range complaint at page 3. This is at JA 613. And then, as you know, the Commission, in its rehearing order, pointed out that in subsequent filings, there were many subsequent filings after that, that there's no mention of section 6.2 whatsoever. So the Commission said that in rehearing order paragraph 9, which is at JA 969 to 970. So it just drives home the point that Texas Eastern said you didn't make it clear, and they didn't follow up and make it clear. The one argument they clearly did preserve is, as you said, Northern Natural. And it seems today at least they're focused more on the fact that there is similar language here in Columbia Gulf's tariff, not the proposition that it created some sort of generally applicable default rule. So could you just explain your response to their argument about paragraph 23 of the decision and the fact that Columbia Gulf has the same tariff obligation, please? So the – I'll say this. The Commission – ironically, I think Northern Natural is actually a good case for what the Commission did here. The Commission followed the Northern Natural pattern, and the Commission said this in its initial order at paragraph 62. This is at JA 869. What Northern Natural did was it analyzed the certificate obligations, the tariff, and the contracts in that case, and they found that ANR had no obligation to Northern Natural. And that's in Northern Natural paragraph 20. Paragraph who? I'm sorry. You said paragraph 20. Paragraph 20 of the Northern Natural order, where the Commission says we're going to consider the merits of the planning by Northern Natural, and we conclude that there hasn't been a violation of the tariff, ANR's tariff, ANR's contractual obligations, and certificated service obligations. It said that there was no violation by ANR. Right. It wasn't at issue whether Northern Natural was in violation, right? That's right. Northern Natural's obligations weren't before the Commission, and that begs the question – I think it's unclear on what – did Northern Natural have a contractual obligation to its shippers to deliver at some pressure? I don't think that issue was before the Commission in that case. Let me ask you this. Does the tariff – does Columbia Gulf's tariff include a definition of the term shipper? I'm sure it does, and I don't think any – I don't think the precedent here could possibly be read to read in and to make Texas Eastern a shipper on Columbia Gulf's system. So why did the Commission refer to Northern Natural as having an obligation under the ANR tariff if the ANR tariff language at issue spoke of an obligation of shippers? The – that case is complicated because there had been a contractual relationship between Northern Natural and ANR, but that had expired, and what the Commission is saying here is that – and they say this in paragraph 64 of the initial order that Northern Natural was not a shipper under – excuse me, the rehearing order. Rehearing order, paragraph 13, is that JA-972, that Northern Natural was not a shipper under ANR's tariff. And I will point out that the Commission is entitled to deference and interpretation of its precedents, and – I mean, I see that it made that statement, but did it explain why they called them a shipper in Northern Natural? They didn't. It may have been because Northern Natural had been a – there had been a contractual relationship previous. But, I mean, I guess that's the point. Like, under kind of the theory of, you know, chinery, et cetera, we don't try to discern what the Commission was thinking from the briefs or your able presentation in court. We need to have the Commission say what it meant and give adequate reasoning. And how is that adequate reasoning of why it was distinguishing its precedent? I think the key, again, is – of the Northern Natural order is the paragraph I was just referring to, which is paragraph 20, which I would say is the central holding of the Northern Natural order. And that's exactly how the Commission characterized it in the initial order in this case, in paragraph 62, which is JA-869, which is this is what the Commission did in Northern Natural. It analyzed its ANR certificate obligations, its contractual obligations, and its tariff, and it found that it had no obligation. But I guess you say that it would have been very easy for them to plead, you know, at the nearest upstream compressor they didn't maintain 750 pounds of pressure. It would also have been very easy for the Commission to say, Well, when we said in Northern Natural that Northern Natural had an obligation to provide pressure sufficient to enter into ANR's system, what we meant by that was X. And that's not true here for this reason. Or, you know, we think that that statement was dictum and here's why. Or, you know, we've rethought that precedent and we're not following it anymore. They could have done any of those things, but they did none of them. Well, I think they did, Your Honor, and in the rehearing order in paragraph 13, they did point out that Northern Natural's obligations weren't before the Commission and that that language was dictum, and the Commission said in any event there is no such rule. I would point out as well that I don't think Northern Natural really applied such a rule. I think the better reading of Northern Natural and the reading that the Commission took was that the Commission in Northern Natural resolved the case by looking at its obligations, and we'd submit that that's exactly what the Commission did in the case before you today. Well, here's what I don't get. If it is, as you say, the proper reading of Columbia Gulf's tariff to say that the shipper shall cause, that shipper doesn't apply to Texas Eastern. It applies to Texas Eastern's customers, so to speak, that they shall cause the gas to be delivered at sufficient pressure, that that's the proper way to read the Columbia Gulf's tariff. How is that administrable when really it is the delivering pipelines like the Texas Easterns of the world that really keep up with the proceedings when Columbia Gulf, you know, expands its system and gets a new certificate, et cetera? I mean, I understand that shippers can and do comment and participate in those proceedings, but isn't the party that would make more sense to play the central role in those proceedings, the other pipelines that are delivering gas to the interconnects? A couple of points on that, Judge Wilkins. I think Range was a participant in Columbia Gulf's certificate proceeding here, the one that added the compression, so they were a participant, and I think the commission was spot on in paragraph 17 of the rehearing order, J.A. 975, when it said Range had an opportunity to protect itself here, and I think the way you do this is you have interconnecting pipelines and you can link them up, and we see that from Exhibit B to the service agreement, which is a J.A. 814, which has a space. It's one of the more important pieces in this record, which has a space, which indicates where the delivery pressure should be, and in all caps, conspicuous language, it says that Texas Eastern shall deliver at the pressure available. That was the space that Range could have negotiated for something with Texas Eastern and could have linked up its pipeline such that you would have a smooth transition. And just from the commission's perspective, what do you envision that these parties who have this ongoing contract moving forward for many years would do? I would refer... Go back and file with more factual support and allegations or do something, renegotiate contracts or... I would hope the latter, Your Honor, and I would refer, Your Honor, to the affidavit put on the record by Texas Eastern, the affidavit by Huffman and by Texas Eastern, and this is in particular Paragraph 6 where a client, Huffman, points out that Texas Eastern has agreed to make agreements for delivery pressure, and they have done that in the past. That, I would submit, is a pretty good step forward here. That's something the parties could negotiate and could make the appropriate arrangements. The problem gets to be when we read further in Huffman's affidavit when he talks about that such an agreement may require facilities, and facilities aren't free, someone's going to have to pay for them, and that's something that's going to have to be worked out by the parties. But here, the decision was made to avoid those costs, and it hasn't worked out fully. But the point is, what the commission is saying, is that parties can work this out, and shippers in particular, as Paragraph 17 of the rehearing order. I have just a couple of questions in more detail. On the simulated situated issue, how is this situation at this meter station different from the Liberty meter and the Kentucky meter? Why shouldn't we assume that where there's a common Texas eastern pipeline, that some decision is being made to use pressure at different points and not where range wants it? They're completely different situations. The meter stations are with, I think alternatively, a municipality and a local distribution company. Here you have a very different situation where you have an interconnect and you have this pressure dynamic between one interstate pipeline and another. And in this regard, the affidavit signs put on the record by Texas eastern is good, in that he addresses Exhibits 10 and 11 that were provided by the complainants. And if you compare the two exhibits, he does this in Paragraph 6, of his affidavit, this is at JA 828, and if you compare those exhibits, they line up, they link up, and you can tell that the volume's reduced to zero, where Columbia Gulf had, through the confirmation process, indicated that it couldn't accept the gas. That's the problem here. We have no indication in this record that a similar dynamic is happening at the meter station that is serving a municipality or a local distribution company. On the force majeure issue, I had a hard time understanding why it would make a difference, whether it ranged with health payment or not, because, I mean, if I haven't paid my credit card bill, I could still dispute a charge, or whether I have paid. I just didn't follow that logic. Fair enough, Your Honor. I don't believe that's the central point that the commission was trying to make there. I think the central point was that the force majeure does not matter here. It doesn't matter because there's no minimum partial obligation in the first place? That's true, and Texas Eastern never asserted that the force majeure is the cause of Columbia Gulf not confirming the scheduled nominations. In 21. They say that's true for most, but not for these 10 days, in 2021. They said they gave credits, but the point is, are they required to give credits even for the 10-day safe harbor period? That's how I understood the claim. But they didn't make that argument in their complaints. The commission, this is an important part of what the commission said at Rehearing Order Paragraph 16, JA 974. Range never showed in its complaints and in the rehearing request that it would be entitled to additional credits, and I think that's true. They don't flesh that out in the complaints. And so here again, and by not making the case as well in the rehearing request, there's a forfeiture argument under NGA Section 19, 15 U.S.C. 717R, which requires the party raise an issue with specificity. But they never spelled out this argument that the force majeure fundamentally was wrong and was invalid in some way. And in fact, if I can add one more thing, they actually say the opposite. In Joint Complaint Paragraph 86, JA 48, they say they reserve the right to raise force majeure in the future. Can I just, you may have addressed this, and I apologize if I missed it. So on the issue of whether there was a forfeiture out there, part of the Section 6.2 argument with regard to the 750 pounds of pressure, are you saying that if they filed a new complaint explicitly raising that, that claim would not be barred by the Commission's orders construing 6.2 or not? I guess I'm just trying to understand. I think they could file a new petition, and they could explicitly. And as I alluded to, I don't think it would be that difficult to articulate this clearly. I don't know how the Commission would resolve that. I guess maybe this is an unfair question. Do you read the Commission's order as having resolved that claim implicitly? I do. The claim was not made that Texas Eastman failed to operate the upstream compressed restriction at 750, point number one. Point number two, the claim wasn't made that there's a causal link between such a theory and what their theory is, is that there's a pressure differential on the interconnection. I don't know if that's helpful. I understand. I guess maybe the better way to answer the question is, do you read the Commission's orders as saying that even if it were so pled, it wouldn't make any difference, they would still not prevail? The Commission certainly said that they didn't make that connection, and that's specifically in footnote 39. I believe that's at JA 970. They explicitly said that range didn't make the connection between the upstream compressor station and the interconnection. Okay. So there is no result of FERC's order that the Danville station has no obligation to operate at 750, which was one way I thought that the petitioners were reading it. There's no such impact of the FERC's order. It just didn't touch that issue. Because it was correct. I think that's correct, that it wasn't raised in this case. Thank you. Thank you, Your Honor. Okay, and then we'll briefly hear from Mr. Etchemendy. I'm probably butchering that. You actually weren't. You got it right on the first attempt. May it please the Court, Matthew Etchemendy for Intervener Texas Eastern. So there's a lot going on in this case, and I'm happy to answer questions on anything. I did want to start on one point that hopefully I can clear up pretty quickly and simply, and that is the shipper issue in Northern Natural, because I do think that that's actually a really straightforward point to resolve. So Texas Eastern is unambiguously not the shipper here. The shipper is Range. And to Judge Wilkins' question about is there a definition of shipper in Columbia Gulf Tariff, the answer is yes. It's cited in our brief, page 31, note 8. It is also quoted in the joint complaint JA-751. That's in a footnote to one of Texas Eastern's pleadings. But the tariff defines shipper as any person or entity requesting or receiving service under Columbia Gulf's rate schedules. So shipper is defined as a person buying service from Columbia Gulf, not an interconnecting platform. So there's no service contract here between Texas Eastern and Columbia Gulf. So there's really no real dispute that as a matter of definition under Columbia Gulf's tariff and also just as a matter of ordinary industry usage that Texas Eastern is not the shipper here. So it's really not credible to argue that the provision applying duties to shippers under Columbia Gulf's tariff applies to Texas Eastern. I mean, that's just unambiguously not right. Now, there is still the question about what do we do with Northern Natural and the language of Northern Natural. So I would be happy to address that as well. So it is not true that the commission said that Northern Natural was a shipper on ANR. And it also didn't say that Northern Natural was bound by that language. What it said was that the analogous language in ANR's tariff applied. Not that it imposed a duty on Northern Natural. Just that it applied. And what did it mean by applied? Well, it resolved that there was no duty on ANR to adjust its pressures downward. The duty wasn't on it to ensure that the gas arrived at sufficient pressures. So that's what it meant by the tariff language applied, which is what it said. It didn't say impose an obligation on Northern Natural. It didn't say Northern Natural was a shipper. So it's sort of ANR as in contraindication to Northern Natural and or its shipper and whoever determines the pressure of what's delivered to ANR. So it's not significant to the holding who's responsible for the obligations on the counterparty side of things. That's between the actual shipper and Northern Natural. So the holding was that ANR did not have an obligation to adjust its pressures. That was just the holding. So it didn't say who, if anyone, had a legal duty otherwise. What about the last sentence of paragraph 23, which reads, therefore the responsibility to deliver gas at a pressure sufficient to allow the gas to enter ANR's system rests with Northern Natural. That's pretty clear. We don't have to interpret whether Northern Natural is a shipper or not. They don't use the term shipper. They just say straight up the obligation rests with Northern Natural. So it doesn't say obligation. It says responsibility. And I think it's pretty clear in context that what it meant by that was that Northern Natural would bear the financial burden of making any necessary adjustments if it wanted to ensure that the deliveries occurred. And remember, Northern Natural is a company. I thought you were going to say that it's the physical responsibility and who ends up paying for it as a matter of contract upstream. Physical responsibility. Well, I think what it was saying was that Northern Natural couldn't try to push an obligation onto ANR to make this change. What it was saying was, look, you're the complainant. If you want the pressures to be adjusted and for this pressure imbalance to be fixed, the responsibility is on you. And what it meant by that wasn't that there was some rule across the board on upstream pipelines that they have an enforceable legal duty to deliver at a certain pressure. It's analogous to saying that a buyer of goods without a warranty is responsible for repairs. It doesn't mean they're required to repair the goods they buy. It just means that they'd have to bear the cost if they did. And so I think that's pretty clear. And I think it's also just taking a step back here. It would be very strange in this one passing sentence that comes at the end of an analysis of ANR's tariffs and contracts if the commission had suddenly without explanation set some kind of default rule that altered contractual obligations on essentially every pipeline in America. I have a couple other questions about force majeure. If FERC had taken up the propriety of the force majeure declaration and held that it was invalid, would you owe Range reservation credits for the 10 days on which Texas Eastern reduced the delivery that it dared due to the... So Range still hasn't made a case on that or explained, you know, what if any additional credits it thinks it would be entitled to. Now, what it does say is that it says it thinks that it may be entitled to more credits under this 10-day safe harbor provision. It says that on appeal. It did not say that on rehearing. It did not even hint at that on rehearing. In fact, this is nowhere in the record at all. That's why when they do on their reply brief eventually get around to quoting it, they have to use a web link rather than a citation to the record. On things that weren't argued, though, did Texas Eastern argue that it didn't have any minimum pressure obligation at ADARE in any event, so didn't need to declare force majeure as a result of the pipeline safety administration's pressure restriction? So let me clear up some things because the record is a little complicated on this, and hopefully I can provide some clarity. So Range and Columbia Gulf were afraid that Texas Eastern would try to evade responsibility, so to speak, in general for the pressure imbalance issues at ADARE by relying somehow on force majeure or sort of blaming it on PHMSA orders. That didn't occur here, and that made a lot of the allegations and the complaints about force majeure and PHMSA sort of drop out of the case. What Texas Eastern, its argument for why it wasn't responsible for the gas that Columbia Gulf didn't accept was that it had no obligation in its tariff to deliver gas at a certain minimum pressure at the ADARE interconnect. Now, there was a force majeure declaration that Texas Eastern made in late May 2021. That had nothing to do with the pressure imbalance issues at Columbia Gulf. It stemmed from a separate anomaly on one of the three lines, a corrosion stress cracking issue that led to a PHMSA order. So essentially what we're looking at here is at the same time that this curtailment was occurring in 2021 and where there were pressure imbalance issues at the ADARE interconnect, there was a separate and unrelated force majeure declaration in effect stemming from the PHMSA order. As a result of that, there were some volumes that Texas Eastern, that Range nominated for delivery that Texas Eastern couldn't even schedule on the basis of force majeure. And for those, Range was given credit in accordance with Section 31.2 of the tariff. I just want to make sure I understand. So in their complaint, they definitely do say that that force majeure declaration was improper and that if it's improper, it's on page 17 and 18 of Range's complaint. If it was improper, they should be entitled to 10 more days. And then paragraph 36 is, based on the foregoing, we respectfully request the commission determine Texas Eastern is responsible for providing reservation charge credits to Range for all volumes that Texas Eastern scheduled but failed to deliver. So how does that line up with what I'm asking? So Range did not raise in its complaint an argument that the force majeure declaration was invalid. I'm sorry if you could point me to the page again where you were seeing this. It's JA 297 to 298. And I know it's difficult to do this on the fly, but it seems to me that's at least where this general topic is discussed. Well, right. So what Range is saying there is that notwithstanding the fact that there was a force majeure declaration in effect there, Columbia Gulf or rather Texas Eastern couldn't claim that, you know, sort of wash its hands of giving any reservation charge credits. But what it doesn't ever say here is that Texas Eastern's declaration of a force majeure event was invalid or improper. And that was the issue that was raised for the first time on re-hearing. Thank you. Just a couple factual questions. There's a meter at the Adair interconnect. Is it before the interconnect, after? Is it along the Texas Eastern pipeline? So the meter at the actual interconnect? Or do you mean the meter stations? No, I mean the meter at the interconnect. How do we know what the pressure is at the interconnect? There is a meter at the interconnect, yes. And that's in the interconnect or before or in Texas Eastern? So unfortunately, candidly, I don't know the physical reality of that. And so too with the Liberty and Kentucky Energy meters, they're measuring pressure in Texas Eastern's pipeline? So they are measuring flows into these local distribution pipelines. So flows off? Correct, off the Texas Eastern's pipeline. So not the pressure in the pipeline? So these, are you referring to the exhibits, the complaint exhibits talking about the meter readings? The chart and, yeah. Yeah, so those are talking about flow numbers, gas going off those. Correct. And can you say which days between June 2021 and July 29, 2021 were affected by the force majeure? Were affected by the force majeure, yes. So this is in the Donaldson affidavit at, JA708. Right, it says a portion. A portion, yes. During the period from June 2nd through July 29th. So that was the period where the separate force majeure declaration was in effect that led some nominations not to be scheduled. But to be clear, over the same period, there were also many nominations that range made that Texas Eastern did schedule, in other words, that it was ready and willing to deliver at the available line pressure. I don't know which days were affected and which days were unaffected. By the force majeure event? Yeah. Well, on many of these days, there would have been both, nominations that were scheduled by Texas Eastern, but not delivered solely because Columbia Gulf didn't accept receipt because of the pressure imbalance. And there would also have been some nominations that were not scheduled due to force majeure. And during the period between July 30th and August 3rd, when Columbia Gulf elected to receive 203,542 decatherms, but the Adair meter was reading only 131 decatherms flowing, why is there a difference there? Is that attributable to the force majeure? That would, I think, principally be due to the, that would have been due to the pressure imbalance and Columbia Gulf's refusal to take receipts. Well, they're saying they elected to receive 203 decatherms and the meter's only reading lower than that. So I'm trying to figure out if they think they're ready to receive more. I apologize. Is there, did you know what page that was or I could look it up, but I'm not recalling that allegation. I just wrote notes. I think it's from Donaldson. It's been a long day. I actually do have one last question just on this reservation charge issue. I understood you to say range never made a claim that they would be entitled to reservation, more reservation credits. If the force majeure declaration was, was wrong, was, was invalid. And I'm the last thing that's tripping me up is paragraph 16 of the rehearing order, which says range has not shown. It would be entitled to additional credits for this category of reductions. Even if the force majeure declaration had been improper, it seems to be assuming they're arguing the force majeure declaration is improper and saying, even if they're right, they're not entitled to more to which I understood ranges answer to be. We'd be entitled to 10 more days. Right. So, so just to respond to that quickly. So in the complaints, as we've said, range never did argue that the force majeure declaration wasn't valid. In fact, it explicitly disclaimed that as the commission noted that being said, as you know, you know, that wasn't really the commission's holding when it rejected this argument. So as it said, I do think it, I do think it provides valid or useful context, but what the commission's holding was, was that range had not asserted or showed that it would be entitled to more credits. If the force majeure clause were invalid and, and that's in the rehearing request, it never did that in the right hearing request. So that was first holding that, you know, range is making this argument on rehearing and it has not asserted or shown that it would be entitled to more credits. If even if the force majeure clause were invalid, therefore we don't need to hold a hearing on it. And that was absolutely a correct holding. If you look through the rehearing press to those pages, you will see absolutely nothing about this 10 day provision and their effort to raise this for the first time on appeal is jurisdictionally forfeited in this court. Very clear under this court's cases, the arguments must be raised with specificity on your hearing. Thank you. What, what is, what is the value to range of a, of a firm contract as you and FERC read the, the documents here? So the value to range of a firm contract is that it has service on Texas Eastern. And that service as opposed to interoperable service is not subject to a prior claim by another shipper. So we can't not serve them because we're too busy serving someone else. That being said, you know, I take your, your question to be, well, you know, what is the value of this agreement to range? If, if this pressure imbalance can, can come up and rearrange is sort of tough. I mean, I will point out a couple of things on this. First of all, range is getting value from this contract. I mean, we're talking about just for context here, you know, we're talking about a period of about a week in 2019 and then a certain period in 2021. So we're just talking about those periods. And during those, even during those periods range was still having gas delivered. Now there were a few days where it was zero, but overall range was still getting gas delivered. So, you know, range is getting value out of, out of this contract. Essentially what range is looking for here in trying to impose a mandate on Texas Eastern or on all upstream pipelines or delivering pipelines to always deliver at, at minimum pressure across an interconnect. It's basically a form of forcing insurance, so to speak, or forcing Texas Eastern to bear the costs that would necessarily occur, such as building additional compression facilities to ensure that pressure balance imbalances like this never arise. And the approach that the commission, you know, has landed on, and this is not a new thing is that this is it's a contract based approach and rational market actors can decide whether or not it's worthwhile to them to pay the extra costs that would be involved in having this kind of, you know, avoiding in advance these types of issues that may or may not crop up in the future. And there are lots of reasons why they might not want to take on those additional costs of installing, for example, additional compressor facilities. That's helpful. Thank you. Thank you. Okay. And we have some rebuttals. Recognizing that we've all been here a long time today, I will be very brief in my response and rebuttal and hopefully save some of this time for my colleague as well. Just really briefly on your last point, Your Honor, about what is the value to range in this contract if there's no guarantee of some discussion with Mr. Eidegger about how, why can't you just renegotiate the contract? We have a mobile Sierra issue there, Your Honors. If we cannot get FERC to undo the contract, unless there's a public interest problem, we've already seen what FERC thinks about the contract. So we have that problem there. I would note also the standard industry practice for interconnection agreements or for agreements where delivery pressures are applicable is where the counterparty to the contract has some knowledge about what the delivery pressures are. That would be something like a power generation facility that has turbines that need to have gas coming in at a certain pressure. That would be a local distribution company that has some knowledge about the pressure that it needs for its system. A shipper has no way of knowing, other than examining the publicly available NAOP information for the upstream and downstream pipelines to figure out what the pressure could be. But the point I'm trying to make is even if we could renegotiate the agreement with Texas Eastern, what would we put in that agreement? So thank you very much, Your Honors. And we'll also hear briefly from Mr. Higgins for Columbia Gulf. Thank you, Your Honor. Just very quickly, I just wanted to make three very brief points in response to what I heard this morning. One is with respect to Columbia Gulf's tariff and how it defines shipper. I'd note that A&R's tariff at Section 5.1.1 defines shipper in the same exact way with reference to rate schedules. Who takes advantage of rate schedules is a shipper. Under A&R's tariff, it's the same definition under Columbia Gulf's tariff. There is no way, at least I haven't heard anyway from FERC during all these proceedings, to distinguish Columbia Gulf's tariff in this case and A&R's tariff in Northern Natural. The second thing I heard was a statement that in Northern Natural, the delivery pipeline was not bound by the receiving pipeline's tariff. But again, Paragraphs 14 and 23, right in conjunction, simply do not permit that interpretation. Again, Paragraph 14, tariff provision requires Northern Natural, the shipper to deliver gas to A&R at pressure sufficient to enter into the pipeline. That was A&R's argument. And then Paragraph 23, we also concur with A&R's interpretation of its tariff requirements. It's very plain. And the very last point I wanted to make was just in response to one of Judge O'Donnell's acknowledges that it made this statement, and it would be very easy for FERC on remand to simply say, yes, we did make that statement, here's what we meant by it, here's why it was wrong, here's why it applies, here's why it doesn't apply. FERC, throughout these proceedings, has never acknowledged that in Northern Natural it applied substantially identical language to the delivering pipeline,  If there are no further questions, we ask that you grant the petition. Thank you. Thank you.
judges: Pillard, Wilkins, Garcia